# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

**09-20555**

**TOM BARKER,**
        **Petitioner,**

CASE NO.:_____
L.T. Case No.: 94-11849CF A02
CRIMINAL DIVISION: T
FIFTEENTH JUDICIAL CIRCUIT

**vs.**

**CIV-LENARD**

**FLORIDA DEPARTMENT OF CHILDREN**
**AND FAMILY SERVICES;**
**FLORIDA DEPARTMENT OF CORRECTIONS;**
**TIMOTHY BUDZ, FACILITY DIRECTOR,**
**FLORIDA CIVIL COMMITMENT CENTER;**
**GEO GROUP INC;**
**STATE OF FLORIDA;**
        **et al., Respondents,**
_____/

MAGISTRATE JUDGE
WHITE

FILED by_____ D.C.

MAR - 5 2009

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## PETITION FOR WRIT OF HABEAS CORPUS

Pursuant to the Federal Rules of Civil Procedure and Statutes, Tom Barker, pro se, respectfully petitions the United States District Court, Southern District of Florida, Miami Division for a writ of habeas corpus directed to the respondent, Florida Department of Children and Family Services, et al., respondents and shows the court as follows:

### I.

### BASIS FOR INVOKING JURISDICTION

This Court has jurisdiction to issue a writ of habeas corpus under 28 U.S.C.A. § 2254. Habeas corpus is the proper remedy to challenge an unlawful involuntary civil commitment under Part V. of Chapter 394, *et seq.* No remedy other than habeas corpus would be adequate to prevent the Petitioner's continued unlawful confinement.

cat / div 2254/ Dade
Case # 09cv 20555
Judge JAL    Mag PWW
Motn Ifp NO    Fee pd $ —
Receipt #_____

1

## **PRELIMINARY STATEMENT**

Petitioner, Tom Barker, mailed a petition for writ of habeas corpus to the Second District Court of Appeal, on August __28__, 2008. Said writ was filed with the State Appellate Court on September 2, 2008, and assigned case no.: 2D08-4342; raising the same legal argument presented by way of 28 U.S.C.A. § 2254 to the U.S. District Court, Southern District of Florida, Miami Division.

Petitioner's petition for writ of habeas corpus was summarily denied by order of the Second District Court of Appeal, on October 29, 2008. NORTHCUTT, C.J., and ALTENBERND and WHATLEY, JJ., Concur.

## **II.**

## **FACTS UPON WHICH THE PETITIONER RELIES**

In support of this petition for writ of habeas corpus, the Petitioner alleges, proffers, and will prove upon a full hearing the following facts:

1. In June 1997, the United States Supreme Court handed down its decision in *Kansas v. Hendricks*, 521 U.S. 346 (1997), approving the detention of Mr. Hendricks, under a Kansas statute for the commitment of "sexual predators." The *Hendricks* decision plainly pointed out the critical importance of labeling the scheme "civil." *See* 521 U.S. at 361. The Florida legislature when passing its similar law dutifully wrote that its intent was to create a "civil commitment procedure." § 916.31, Fla. Stat. (Supp. 1998)(which was amended and renumbered, effective May 26, 1999, as § 394.910, *et seq.*, Florida Statutes.)

2. The State of Florida filed a petition seeking Petitioner's involuntary civil commitment as a sexually violent predator, pursuant to § 394.910, *et seq.*, Fla. Stat. (the Jimmy Ryce Act), on October 13, 1999.

3. Petitioner ended his sentence in the Department of Corrections (DOC) on October 13, 1999, and was immediately taken into custody by the Department of Children and Family Services (DCF) upon his release by the (DOC).

4. Petitioner was committed at a trial by jury on July 17, 2002, in the Circuit Court of the Fifteenth Judicial Circuit.

2

**The Jimmy Ryce Act Statute**

5.     Nevertheless, the legislature named the bill after "Jimmy Ryce," a crime victim. *See* Chap. 98-64, § 1, Laws of Fla. The state has never alleged or proven that the man accused of that crime had any mental disorder.

6.     The key supporters of this Act were Representative Villalobos and the parents of Jimmy Ryce, Donald and Claudine Ryce. They jointly authored an editorial column arguing that the Act is beneficial precisely because it lengthens the sentences of those currently incarcerated: "Others have suggested that increasing criminal sanctions is a better approach. We disagree. Just realize that new sanctions cannot be imposed on those who are currently in prison. Also, increased sanctions will not eliminate plea bargains that reduce prison sentences." Alex Villalobos & Don and Claudine Ryce, *Spare children the horror inflicted on Jimmy,* Miami Herald, Jan. 4, 1999, at 13A.

7.     These sentiments echoed comments in a hearing before the House of Representatives, Committee on Family Law and Children, referring to this Act as a "stop-gap" measure to continue to incarcerate sex offenders until the legislature increases penalties for sex offenders.

8.     This Act came on the heels of the legislature's failed efforts to prevent the early release of violent offenders by laws that retroactively revoked inmates' gain and good time credit. The courts have disapproved of those methods of continuing or extending confinement. *See Lynce v. Mathis,* 519 U.S. 433 (1997); 701 So.2d 543 (Fla. 1997).

9.     The legislature originally transferred the new Act (with minor amendments), to Chapter 394, the *civil* mental health chapter (usually referred to as the "Baker Act"). The legislative history explains the relabeling: "By removing the Act from ch.916, F.S. confusion is lessened with regard to such cases being civil in nature and not criminal." Senate Staff Analysis and Economic Impact Statement CS/CS/CS/SB 2192, p. 22, (April 15, 1999).

10.   The legislature did not intend, however, for cases to be procedurally treated like other civil commitments:

The Legislature intends that persons who are subject to the civil commitment procedure for sexually violent predators under this part be subject to the procedures established in this part

3

*and not to the procedures in part I of this chapter. Less restrictive alternatives are not applicable to cases initiated under this part.*

§ 394.911, Fla. Stat. (2002).

11. In addition to prohibiting less restrictive alternatives, the legislature also did not provide a "patients bill of rights," as it did for persons committed under the Baker Act. The Baker Act's bill of rights gives patients the rights to individual dignity, treatment, express and informed consent, communication outside the community and visitation, care of personal effects, voting in public elections, and habeas corpus to secure release. *See* § 394.459, Fla. Stat. (2002). A similar bill of rights is provided for criminal committees under Chapter 916. *See* §§ 916.107, Fla. Stat. (2002). Additionally, patients facing an involuntary commitment hearing under the Baker Act have a right not to testify at the hearing. *See* § 394.467(6)(a)2, Fla. Stat. (2002). There is no similar provision fore those facing an involuntary commitment hearing under this Act in question here.

12. The legislature made escape from a commitment under the Act a crime. *See* § 394.927(1), Fla. Stat. (2002). Escape from a Baker Act commitment was not a crime; instead the facility administrator merely conducted a search and returned the patient to the facility. *See* § 394.467(8), Fla. Stat. (2002).

13. Additionally, the legislature placed procedural barriers in the way of release under the Act. If a Baker Act patient no longer meets the criteria for involuntary commitment, the facility administrator simply discharges the patient. *See* § 394.469(1), Fla. Stat. (2002). No such power of discharge exists under the act. Instead, the Department of Children and Family Services can only authorize the patient to petition the court for discharge. *See* § 394.919(1), Fla. Stat. (2002). The state attorney is authorized to find experts and contest this petition. *See* § 394.919(2), Fla. Stat. (2002).

14. The legislature also created additional hurdles in the review hearings. Baker Act commitments are for a definite period up to six months. *See* § 394.467(6)(b), Fla. Stat. (2002). If the facility administrator believes the person continues to meet the criteria for commitment, the facility administrator may file a petition for continued involuntary placement. *See* § 394.467(7)(b), Fla. Stat. (2002). The facility administrator must

medically justify the continued confinement and a full hearing is automatic. *See* id. The patient has a right to demand to be present. *See* id.

15. By contrast commitments under the Act are indefinite. *See* § 394.917(2), Fla. Stat. (2002). Once a year the court holds a "limited hearing to determine whether there is probable cause to believe that the person's, condition has so changed that it is safe for the person to be at large and that the person will not engage in acts of sexual violence if discharged." § 394.918(3), Fla. Stat. (2002). The state apparently bears no burden of proof; instead the committed person must prove that he has "changed," and has no right to be present at this "limited hearing." *See* id. Only if the court finds probable cause of change is the patient entitled to a full hearing. *See* § 394.918(4), Fla. Stat. (2002).

16. The court system has responded to this clear legislative intent. Since there are no standardized rules, each Circuit has taken it upon themselves how the individual Circuit processes these cases. The Chief Judge of the Eleventh Circuit initially ordered that the criminal division hear cases brought under the Act. *See In re: Assignment of Circuit Court Judges of Criminal Division to Hear Civil Commitment Proceedings Pursuant to §§ 916.31-916.49, Fla. Stat.* Adm. Order No. 98-50, Case No. 98-2 (Dec. 18, 1998). The Administrative Judge for the Criminal Division followed up by ordering that cases filed under the Act be given a civil case number, but be transferred to the *criminal* division that presided over the underlying criminal conviction. *See* Memorandum from Thomas N. Carney, Administrative Judge, Criminal Division to Leonard Arnaiz, Chief, Criminal Court Division, Clerk of Courts (Dec. 29, 1998).

17. The civil case numbers are effectively inoperative. The Clerk of the Court uses the underlying *criminal* case numbers to track filings in cases under the Act. Filing any pleadings under the civil case number without including the old criminal case number can result in a document being lost or at least seriously delayed.

18. The jurors who will hear these cases will be from the *criminal* jury pool. They will have been told that they are being called to sit as jurors in criminal cases. They will come to the Criminal Justice Building where these cases will be tried.

19. The Supreme Court Committee on Standard Jury Instructions in Criminal Cases proposed the standard jury instructions in these cases. *See Standard Jury Instructions-Criminal Cases (99-2),* 777 So.2d 366, 370 (Fla. June 2000). Almost all of the standard

jury instructions are patterned after the *criminal* jury instructions, not the civil jury instructions.

20. The District Courts of Appeal have found that the Florida Rules of Civil Procedure are inadequate and poorly designed for cases brought under the Act. *See Sjuts v. State,* 754 So.2d 781, 784 (Fla. 2d DCA 2000); *Meadows v. Krischer,* 763 So.2d 1087, 1090 n.4 (Fla. 4th DCA 1999).

21. In civil cases, all counter-claims can (and in some cases must) be brought in the same action. *See* Fla.R.Civ.P. 1.170. In cases brought under the Act, the Public Defenders are prohibited from filing such counter-claims. *See* § 27.51 (1)(d), Fla. Stat. Indeed, State Attorneys have continuously resisted their duty to provide discovery in cases brought under the Act. The State Attorney's position has been that it has no duty to provide any material not present in the files of their own office – essentially the same as its discovery obligations in *criminal* cases. Compare Fla.R.Crim.P. 3.220 *with* Fla.R.Civ.P. 1.280-1.390. *Id.*

22. The court system naturally treats cases brought under the act as criminal because historically, care, control, and treatment of sex offenders with psychosexual disorders was part of the prison sentence. Under Chapter 917 of the Florida Statutes (repealed on July 1, 1991), the Department of Corrections (DOC) and the Department of Health and Rehabilitative Services (HRS) jointly identified prisoners "who have been sentenced for the commission of a crime involving a sex offense, who are not psychotic, and who suffer from a psychosexual disorder, but are competent and amenable to treatment." § 917.012 (2), Fla. Stat. (1989).

23. From that group, sex offenders were either treated by the DOC or HRS depending on the individual prisoners needs: "From such group of offenders, the Department of Corrections and the Department of Health and Rehabilitative Services, jointly, shall also identify those offenders who may be treated by the Department of Corrections and those offenders who require the specialized services of the Department of Health and Rehabilitative Services, using professional psychiatric and psychological teams of the respective agencies." § 917.012 (2), Fla. Stat. (1989).

24. The prisoners needing HRS services were transferred to the custody of HRS. § 917.012 (3), Fla. Stat. (1989). HRS determined the facility and modalities for care and treatment,

as well as the manner and sequence of treatment and parole eligibility dates. *See* § 917.012 (5) & (7), Fla. Stat. (1989). Chapter 917 treatment programs were housed in three mental health facilities: South Florida State Hospital, North Florida State Hospital, and the North Florida Evaluation and Treatment Center. The confinement under the present Act is even more secure than under the previous statute.

25. HRS provided annual written reports and returned the prisoner when "the department has exhausted all appropriate treatment for the offender." § 917.012 (4) & (8), Fla. Stat. (1989). Under Chapter 917, the time in treatment was part of the prison sentence: "Time spent in treatment programs of the Department of Health and Rehabilitative Services shall be considered time served on the sentence imposed upon the offender by the court." § 917.014, Fla. Stat. (1989).

26. The treatment under Chapter 917 was similar to the treatment program established under the present statute. Both programs are based primarily on group therapy. Both use a cognitive/behavior approach.

27. Even after the abolition of Chapter 917, Chapter 945.12 (6), Fla. Stat. (2000), still remained in effect, though this provision is almost never used. The Department of Children and Family Services has no current program for treatment of sex offenders prior to their release from their prison sentences.

28. Funding for a person committed to treatment under the current Act is approximately only 65 percent of the money spent on a patient in a state mental hospital. For those detained pending a commitment trial, the state spends about $45 per person per day, basically the same as for a prisoner. The results of these legislative and executive funding decisions are what would be expected, as seen in the type of facility, the rules and regulations, the way people are transported, and the type of "treatment." Simply put, the system warehouses people in prison-like conditions with no realistic hope of ever being released. The Miami Herald in a multi-part series has chronicled the woeful under-funding problem, as well as lack of adequate treatment. *See* Jason Grotto, *Predators Among Us*, Miami Herald, January 29, 30, 31, 2006, and February 1, 2006, and June 19, 2006.

**29. Following the Miami Herald's investigative series, on February 16, 2006, the Florida House of Representatives' Fiscal Counsel held hearings to address the**

funding and treatment problems identified by the Miami Herald's investigation. *See In re: Jimmy Ryce Hearing: Before the Florida House of Representatives Fiscal Counsel,* February 16, 2006.

### The State's Failure to Promulgate Administrative Rules

30. *Background:* The Legislature mandated the Florida Department of Children and Family Services (DCF) promulgate administrative rules. Those rules were to govern different aspects of the Sexually Violent Predators Involuntary Civil Commitment Act (formerly known as the "Jimmy Ryce Act"). The State of Florida has failed to promulgate or even propose said administrative rules. The state in committing the respondent without such administrative rules violated the equal protection and due process clauses of the state and federal constitutions.

31. The "Jimmy Ryce Act" took effect on January 1, 1999. The Act was amended and renumbered by Chapter 99-222, and took effect as amended on May 26, 1999. In the amendment process, in section 25 of Chapter 99-222, the legislature mandated the Florida Department of Children and Family Services adopt rules in five areas. Section 394.930, Fla. Stat. Required the adoption of rules:

   The Florida Department of Children and Family Services shall adopt rules for:

   (1) The procedures that must be followed by members of the multidisciplinary teams when assessing and evaluating persons subject to this part;

   (2) The criteria that must exist in order for a multidisciplinary team to recommend to a state attorney that a petition should be filed to involuntarily commit a person under this part. The criteria shall include, but are not limited to, whether:

       (a) The person has a propensity to engage in future acts of sexual violence;

       (b) The person should be placed in a secure, residential facility; and,

       (c) The person needs long-term treatment and care.

   (3) The designation of secure facilities for sexual violent predators who are subject to involuntary commitment under this part;

(4)   The components of the basic treatment plan for all committed persons under this part;

(5)   The protocol to inform a person that he or she is being examined to determine whether he or she is a sexually violent predator under this part.

§ 394.930, Fla. Stat. (1999).

The importance of the promulgation of rules in the above areas can be found, at least in part, in the Senate Staff Analysis and Economic Impact Statement relating to the May 26, 1999, amendment of the Act. The Analysis states:

Currently, there are no administrative rules that have been promulgated by the Department of Children and Family Services to implement this act. The department has taken the position that it does not have the statutory authority it needs to promulgate rules in accordance with the Administrative Procedures Act. The department should develop guidelines for standard qualifications for a person to serve on a multidisciplinary team. The person must be able to testify as an "expert" in court proceedings. In order to comply with the statutory time frames, it would also be beneficial to have the department develop rules establishing the procedure in which cases are processed from the time of receiving referrals through the time team members testify in trials and a verdict is rendered.

*Senate Staff Analysis and Economic Impact Statement,* 17 (April 15, 1999).

The Senate Analysis also found deficiencies in specific areas of the administration of the Act, hence the need to require the Department to adopt administrative rules. As to the development of treatment plans for those committed, the Analysis reported:

[c] urrent treatment plans and the manner in which treatments are to be used are authorized by the Department, which is the state agency that is charged with providing all treatment, care, and custody to persons committed under this act, *are unknown to the public and persons subject this act.* For purposes of notice, however, basic treatment plans, authorized treatments, and the process in which treatments are authorized to be used in its facilities, should be developed and provided by rule.

*Id. At 17.* (emphasis added).

The Analysis also concluded that persons may not even know they are being evaluated for possible commitment:

Many persons in the system that have a conviction for a sexually violent offense that would qualify them for referral to the Department of Children and Family Services are not aware that they are being assessed and evaluated for possible involuntary civil commitment for an indeterminate period of time…. *In the interest of fundamental fairness,* the DCFS should develop protocol which would serve to put persons on notice that they are facing possible involuntary civil commitment as a sexually violent predator.

*Id.* At 7. (emphasis added).

The Analysis found that confusion exists over the makeup and functioning of the multidisciplinary team(s). The report states:

Confusion still remains in the courts as these cases move through the process, however, because there is not agreement as to what these persons [the multidisciplinary team members] must do collectively and what they may do individually in providing its assessment and diagnosis that the person has a personality disorder or mental abnormality….

*Id.* At 15. Finally, the Analysis also found that the "definition and location of an "appropriate secure facility" has posed a problem for the implementation of the act." *Id.* At 15. The adoption of administrative rules, as mandated by the legislature, would address all of these issues.

The State Legislature has required the adoption of the rules. The Department of Children and Family Services, however, has not shown a sincere effort at doing so. Nearly nine years ago, on November 29, 1999, the Department held a "rule development workshop." Notice of the workshop appeared in Volume 25, number 43, of the Florida Administrative Weekly (October 29, 1999). Since that workshop, on information and belief, no other workshops have occurred, and no rules have been proposed.

State law requires that administrative rules be "drafted and formally proposed… within 180 days after the effective date of the act, unless the act provides otherwise." § 120.54(1)(b). Fla. Stat. According to section 120.54(1)(a0, "[r]ulemaking is not a matter of agency discretion." The deadline for the drafting and formal proposal of the rules was November 22, 1999. As of that date, the Department had not held it's first and thus far, only, workshop. The failure to draft, propose and adopt administrative rules as directed constitutes a violation of the Petitioner's due process and equal protection rights as guaranteed by both the Florida and United States Constitutions.

**The Department Failed to Adopt Rules Governing the Procedures to Be Followed by the Multidisciplinary Team in Assessing and Evaluating the Petitioner**

The first deficiency is the lack of a rule setting forth the "[p}rocedures that must be followed by members of the multidisciplinary teams when assessing and evaluating persons subject to this part." When the multidisciplinary team(s) determines that a face-to-face evaluation is needed, the Department has vacillated between one person doing one face-to-face evaluation of the person, to two people each doing a separate face-to-face evaluation, back to a single interview, and then back to two separate interviews. According to Dr. Karen Parker, Clinical Director of DCF's sexually violent predator program, (in the distant past when the Petitioner was then evaluated face-to-face), if the two initial face-to-face evaluators disagree on whether the person should be committed, the <u>sometimes</u> a third evaluator is asked to conduct a face-to-face evaluations. Other times, a third face-to-face evaluation is not done. No rule exists to govern these situations or to guide the multidisciplinary team on when and under what circumstances a third evaluator is asked to do a face-to-face evaluation. As a result, some respondents had one face-to-face evaluation while others had two or three. This results in disparity in those cases where a second or third face-to-face evaluation may have resulted in an evaluator finding that the person should not be committed.

During discovery and depositions it was revealed that during the period that Petitioner was being evaluated, the understood policy in place for the multidisciplinary teams was that a second evaluation would not be done if the first evaluator found that one being evaluated did not fit the criteria. However, even though Dr. Hodges, as the initial face-to-face evaluator, found that Petitioner did not meet the criteria for commitment a follow-up evaluation was done. Drs. Jeffery

Benoit and Chris Robison conducted the second evaluation, and because Dr. Robison was not yet licensed, they told the Petitioner that they "only counted as one"—though in the commitment trial both were allowed to testify against Plaintiff. The second evaluators came under the false assumption that the first evaluator had recommended commitment, since that was the policy in place at the time; therefore, a higher standard may have inadvertently been used because of the mistaken belief that a face-to-face evaluator had already recommended commitment. Regardless, it may have caused unfair bias. It also underscores how a lack of standardized rules allows deceitful practices and arbitrary, unpublished policies—even allowing targeting of individuals because somebody's personal predilections; thus denying equal protection to Petitioner and all persons being evaluated or being considered for evaluation.

Even though the aforementioned policy was not governed by a published Rule, Petitioner was certainly denied Equal Protection when somebody decided to go against the policy in place and send a follow-up team of evaluators. The lack of administrative rules denied Petitioner an adequate remedy for attacking this blatant violation of policy and procedure—violating his due process rights.

Some cases have only had one evaluator conduct a face-to-face evaluation. On at least one case, the multidisciplinary team recommended no face-to-face evaluation of the person, and no commitment proceedings. However, the state attorney subsequently sent additional information to the team, and made a request that the person be interviewed. As a result, two evaluators conducted separate interviews of the person. Subsequently, the team changed its position and recommended commitment. The appearance and reality is that no uniform policy exists, and that all persons are not being treated equally.

The lack of a rule setting forth the procedures to be followed in assessing and evaluating persons leads to disparities and inconsistencies in the manner which two similarly situated people are evaluated for commitment. For example, in this case, three psychologists interviewed Petitioner. Dr. John Hodges, PhD., interviewed him on one date, and Dr. Jeffrey Benoit, PhD., in conjunction with a then-unlicensed psychologist in training, Chris Robison, conducted an interview of Petitioner on a different date. According to the Department of Children and Family Services, the face-to-face evaluators are part of the multidisciplinary team. However, the evaluators are free to use whatever means they wish to do their evaluations because adequate rules do not exist.

On May 5, 1999, the Department of Corrections identified the Petitioner as a sexually violent predator under the Act and notified DCF of this finding by letter. Two psychologists working for DCF reviewed Petitioner's DOC records and concluded that the Petitioner met the "clinical criteria" for "further evaluation" under the Act. They advised DCF of their opinion on August 19, 2000, without explanation or detail as to the reasons for their opinions or information about how the opinions were reached. On August 19, 1999, the Petitioner became the target for in-person, formal, forensic psychological evaluations during which a decision was made that Petitioner met criteria for civil commitment. The purpose of the clinical interview conducted by the psychologists was to facilitate the classification of the Petitioner as a sexually violent predator. At this "official proceeding," a decision was made based on the Petitioner's performance that resulted in his continued confinement. This involuntary confinement represents a "detrimental change to the conditions of the [Petitioner's] liberty" because, absent this critical decision, the Petitioner would have been released from custody. On October 7, 1999, the multidisciplinary team sent a letter to the prosecutor stating that they recommended filing a petition seeking Petitioner's commitment.

Administrative rules governing the procedure to be followed by the multidisciplinary team in assessing and evaluating people have never been established. This lack of standardization allows for mistakes and inconsistencies—sometimes "worst of the worst" types of offenders are released from prison without as much as a recommendation for a face-to-face evaluation and at other times low risk offenders are recommended. (Petitioner opines that with adequate administrative rules in place, an Access program could be created which could easily and more effectively choose which inmates nearing the projected final 2-years of their sentence qualify for a closer examination by a multidisciplinary team. This would be more efficient than leaving this particular part of the process to a handful of personnel who may allow their personal predilections interfere.)   Consequently, the entire assessment and evaluation process is arbitrary and has the potential for substantial abuse and prejudice.

**The Department Failed to Adopt Rules Governing the Criteria That Must Exist Before the Multidisciplinary Team Can Recommend Commitment**

As a result of the failure of the Department to adopt rules, no one can be certain what standardized criteria must exist before a disciplinary team is able to recommend to a state

attorney that a petition for commitment be filed. The statute itself does not specify the criteria. Consequently, different criteria could exist in each case. One person may be recommended for commitment based upon one set of criteria, and someone else recommended for commitment based on a totally different set of criteria.

The same problems arise in looking at "[t]he criteria that must exist in order for a multidisciplinary team to recommend to a state attorney that a commitment petition be filed to involuntarily commit a person under this act." § 394.930(2), Fla. Stat. The legislature specified that the "criteria shall include" whether the person "has a propensity to engage in future acts of sexual violence;" "should be placed in a secure, residential facility;" and "whether the person needs long-term treatment and care." § 394.930(2)(a), (b), and (c), Fla. Stat. Again, however, the Department failed to adopt a rule implementing this provision. The evaluation process is different, depending on which psychologist(s) or psychiatrist(s) are used by the Department to conduct the evaluation. Each of the evaluators is using different methods to do their evaluations, without any standard or rule set by the Department. For example, the contract with these evaluators requires them to use at least one so-called "actuarial" instrument to determine the propensity to engage in future acts of sexual violence. Some evaluators use the RRASOR (Rapid Risk Assessment for Sex Offender Screening Tool-Revised), some use the hare PCL-R (Hare Psychopathy Checklist), and some use the MMPI-2. Some use varying combinations of two or more of the instruments. Two similarly situated individuals may be evaluated by two different evaluators using different instruments, resulting in disparate treatment. Even when two different evaluators evaluate the same person, different instruments and methodology are used; sometimes resulting on two different opinions, and often times resulting in conflicting or inconsistent actuarial test results. The entire assessment process may be compared to the Salem Witch trials. More particularly, the methods used in an attempt to identify and assess those alleged to be sexually violent predators can be compared to those used to identify witches in 1692.

In Petitioner's case, Dr. John Hodges relied upon the MnSOST-R and the RRASOR instruments. Dr. Benoit relied upon the MnSOST-R, the PCL-R, and the MMPI instruments. These different methods result in a lack of standardization in the procedures and protocol used to evaluate a person for commitment. In fact, in this case, Dr. Hodges scored the MnSOST-R result at a "plus two" (low risk) while Drs. Benoit and Robison scored it at a "plus seven," (moderate risk) according to their reports, and then clarified at depositions, it should have been a "plus six."

At deposition, Dr. Benoit learned he and Chris Robison were using an older, outdated version of the so-called actuarial instrument and a re-scoring would have lowered Petitioner Barker's score to a "plus four" (low-moderate-risk). According to the instrument developers, the higher the score, the greater the risk of recidivism. These types of errors result, at least in part, because of the lack of administrative rules governing the use of such "actuarial instruments" during the assessment process.

Some evaluators have administered MMPI-2 tests during the face-to-face interview, while others have relied upon old MMPI results in the person's Department of Corrections file. Some review the DOC file during the interview, while others review it before the interview. Some evaluators contact witnesses and victims, while others do not. Some evaluators have the person sign a release form, while others use release forms with different language. Some evaluators provide legal advice to the person about the results of agreeing to an evaluation and actively attempt to persuade the person to cooperate – without the benefit of consulting with counsel. In this case Drs. Benoit and Robison engaged in coercion, misrepresentation, fraud, and collusion against the Petitioner. The lack of administrative rules, recognized by the Legislature to be important, has resulted, and will continue to result in great disparity in the treatment of those being evaluated for the commitment process. Each evaluator is able to choose what cutoff score they will use to determine who qualifies for commitment, instead of a standardized rule that realistically should require the score that the developers of each test recommend.

Finally, as the legislature recognized, no one who is committed knows what he has to do to "get out." The Senate Staff Analysis stated bluntly that the "treatment plans and the manner in which treatments are to be used are authorized … are unknown to the public and persons subject to this act." *Senate Staff Analysis and Economic Impact Statement,* April 15, 1999, at p. 17. Without the administrative rules, no one knows what they are required to do, or what the treatment plans are, or what they need to do to be released.

### The Department Failed to Adopt Rules Governing the Protocol to Inform a Person That He Is Being Examined to Determine Whether He Is a Sexually Violent Predator

Florida Statute section 394.9155(7) provides that if a person refuses to be interviewed or refuses to fully cooperate with members of the multidisciplinary team, the court may impose a sanction. The discretionary sanction may be to prohibit the person's own experts from testifying

about their examination of Petitioner or to allow the multidisciplinary team access to all reports and evaluations by the person's own experts. Because there is no statutory allowance for counsel to be appointed prior to the evaluation, people are being asked to make a decision of whether or not to participate in a face-to-face evaluation--without the advice of counsel. There were no rules governing what the evaluator had to tell the Petitioner at the time of the evaluation back in the year 1999. No rule is in place that requires the statute to be explained to the person, or which requires the effects of failing to participate in an interview to be explained. No rule requires the evaluator to honor a request of the person to consult with counsel before making a decision that may affect the subsequent court proceedings.

**The Department Failed to Adopt Rules Establishing the Basic Treatment Plan for Persons Committed Under the Act**

Petitioner should not have been committed; no rules are in place mandating any treatment plan or protocol. Consequently, the Petitioner does not and cannot know what it is he must do to "successfully complete a treatment plan, and thus, his commitment is essentially a life sentence, without hope of release. Such constitutes punishment – an extension of Petitioner's already completed prison sentence. Further, Petitioner is being housed in an old correctional facility; no rules govern the administration and designation as to whether it is suitable for housing those sought to be committed under the Act—especially in light of the Legislature finding that "…the prognosis for rehabilitating sexually violent predators in a prison setting is poor…" , Fla.Stat. 394.910.

**The Repeal of Section 917.012, Florida Statutes, Did Not Preclude the Department of Corrections From Transferring The Petitioner, If Indeed Petitioner Was in Need Of Sex Offender Treatment While Serving His Criminal Sentence**

Effective July 1, 1991, in light of a severe budgetary shortfall, the Florida Legislature repealed § 917.012, which prescribed the procedures, treatment and handling of MDSO's Ch. 91-225 preamble and § 25, Laws of Fla. (1991). However, the legislature left intact § 945.12, Fla. Stat., which even today authorizes the Department of Corrections to transfer prisoners

requiring special services, *including treatment for sexual deviation, to appropriate public or private facilities that offer treatment and secure confinement.*

The Department of Corrections had the legislative authority under § 945.12 at all times during Defendant's criminal sentence to transfer him from the custody of the DOC to the DCF for sex offender evaluation and treatment in accordance with procedures of  § 917.012:

**945.12. Transfers for Rehabilitative Treatment**

(1)          The Department of Corrections is authorized to transfer substance abuse impaired persons, as defined in chapter 397, and tuberculosis or *other prisoners requiring specialized services* to appropriate public or private facilities or programs for the purpose of providing specialized services or treatment for as long as the services or treatment is needed, *but for no longer than the remainder of the prisoner's sentence.*(emphasis added)

(4)          When, in the opinion of the superintendent of an institution to which a prisoner has been transferred, such prisoner has been cured, or will no longer benefit from treatment at that institution, other than a mentally ill prisoner, the superintendent shall notify the department which shall, at the earliest practicable date thereafter, convey such prisoner to the appropriate classification center for reclassification.

(6)          A prisoner who has been determined by the Department of Children and Family Services and the Department of Corrections to be amenable to rehabilitative treatment for *sexual deviation,* and who has voluntarily agreed to participate in such rehabilitative treatment, may be transferred to the Department of Children and Family services provided appropriate bed space is available. (emphasis added)

Section 945.12, Fla. Stat. (1999)

Accordingly, even in light of the 1991 repeal of § 917.012, during Petitioner's prison term, rehabilitative sex offender treatment was and is still available even today under § 945.12. *State v. Mendoza,* 591 So.2d 1029 (Fla. 3d DCA 1991), *rev. den.* 599 So.2d 654 (Fla. 1992); § 945.12 Fla. Stat. (1999).

It should be noted that had Petitioner been transferred to DCF custody for the residential sex offender treatment, *it would have had* a direct bearing on the length of Petitioner's DOC sentence, and thus affected substantive due process. *Dorman v. State,* 457 So.2d 503 (Fla. 1st DCA 1984), citing Committee Note (d)(11), *In re Rules of Criminal Procedure (Sentencing Guidelines),* 439 So.2d 848, 852 (Fla. 1983).

The question of whether this Petitioner was a suitable candidate to enter the DOC/DCF, program for mentally disordered sex offenders could have been answered only after he had been screened during his sentence by the persons and entities in charge of the facilities with the expertise to examine and evaluate the Petitioner for that purpose.

Notwithstanding, the legislative repeal of § 917.012, the statutes in effect at the time of Petitioner's crime control the penalty at sentencing. *Cook v. State,* 519 So.2d 31 (Fla. 2d DCA 1987); *State v. Pizarro,* 383 So.2d 762 (Fla. 3d DCA 1980).

**Further, any subsequent repeal or amendment of § 917.012, Fla. Stat. cannot effect punishment for any crime previously committed by Petitioner.** ***Skinner v. State,*** **383 So.2d 767 (Fla. 3d DCA 1980), citing** ***Castle v. State,*** **305 So.2d 794 (Fla. 4th DCA 1974),** ***aff'd,*** **330 So.2d 10 (Fla. 1976).**

### III.

### THE NATURE OF THE RELIEF SOUGHT

The nature of the relief sought is for the Honorable Court to: A). Order an evidentiary hearing and Order Petitioner transported and physically present at said hearing before the Court; B). Appoint willing and able counsel to properly present and substantiate Petitioner's claim(s); C). Order the Petitioner's immediate release and the petition for involuntary civil commitment dismissed with prejudice; D). Any further relief that it may appear he is entitled as the court deems just and proper.

# IV.

## ARGUMENT

### I.

## DUE PROCESS AND EQUAL PROTECTION VIOLATIONS AGAINST PETITIONER DUE TO THE STATE'S FAILURE TO PROMULGATE ADMINISTRATIVE RULES

The lack of adequate rules, in violation of the due process clause of the Fourteenth Amendment of the United States Constitution and Article I, sections 2 and 9 of the Florida Constitution and the Equal Protection of the Law, results in arbitrary and capricious application of the Act to the Petitioner.

The United States Supreme Court has said that "the guarantee of due process requires that the means selected shall have a reasonable and substantial relation to the object sought to be attained and shall not be unreasonable, arbitrary, or capricious." *State v. Saiez,* 489 So.2d 1125 (Fla. 1986) (striking down a criminal statute on substantive due process grounds). *See Nebbia v. New York,* 291 U.S. 502, 525 (1934. In similar contexts the Florida Supreme Court has addressed substantive due process. About the Prison Releasee Reoffender Act the court said:

Thus, the punishment of the offender will vary from case to case based upon the benign nature, or susceptibility to intimidation, of the criminal's victim. Should an armed robber be punished less severely because his victim happens to be forgiving rather than somewhat vindictive? Moreover, this provision of the Act promotes harassment and intimidation of the victim. Apparently, this due process argument in regard to a victim veto has not been raised in any other case involving the validity of the Prison Releasee Reoffender Act, nor has it been briefed or argued in the instant appeal. We therefore do not determine its viability here.

*State v. Cotton,* 25 Fla. L. Weekly S463 (Fla. 2000). Using the same reasoning, should a person be petitioned for commitment solely because of the methods and standards a certain psychologist prefers to use, over the methods and standards of another psychologist, simply because the state failed to adopt rules requiring a uniform procedure? After all, in Bush v. Gore, 531 U.S. 98 (U.S.Fla., 2000), the U.S. Supreme Court decided that a lack of statewide standards for "determining a legal vote" violated 14th Amendment Equal Protection, each vote had to be treated equally. Should a decision concerning one's liberty have less protection than one's vote?

Shouldn't each one possibly being subjected to selection and evaluation procedures of The Act be treated equally? Without adequate rules, such standardization is impossible.

In striking down Florida's "gang association statute" section 874.04, Florida Statutes, on substantive due process grounds, the Florida Supreme Court said:

The Fourteenth Amendment of the United States Constitution provides in pertinent part that no State shall "deprive any person of life, liberty or property without **due process** of law." Article I, section 9 of the Florida Constitution similarly provides that "[n]o person shall be deprived of life, liberty or property without **due process** of law." The constitutional protection provided by the **due process** clauses encompasses both procedural and substantive **due process**. *See, e.g.,* Department of Law Enforcement v. Real Property, 588 So.2d 957, 960 (Fla. 1991).

*State v. O.C.,* 748 So.2d 945, 948 (Fla. 1999). (See cases cited therein as other examples of statutes violating substantive due process). The court has also said "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Wyche v. State,* 619 So.2d 231, 237-38 (Fla. 1993). When different psychologists making up various multidisciplinary teams, apply their procedures differently, and on a subjective basis due to the absence of standardized rules, then their actions run afoul of these sacred principles.

For example, Petitioner suffered great harm when members of a multidisciplinary team judged his one and only felony conviction, burglary with assault &/or battery, to have been sexually motivated (though such a judgment was beyond their scope of training) even after the victim testified that she did not believe it was sexually motivated. In fact, without rules determining exactly what constitutes a sexually motivated offence, the law has brought a change to the instructions read to those accepting a plea bargain; they must be instructed that a future determination of past or present conviction(s) may be labeled as sexually motivated and subject them to indefinite civil commitment at the completion of their sentence. Fla.R.Crim.P. Rule 3.172(d)(9). That this instruction must be read to anyone accepting a plea (regardless of the appearance of the nature of past or present offenses) underscores the confusion that even the judiciary faces in determining sexual motivation. Sound guidelines must be in place before

20

anyone involved in the process will be able to use the same standard. Without clear guidance, this facet of The Act is unconstitutionally vague.

The lack of administrative rules may also make the entire Act void for vagueness. In Kolender v. Lawson, 461 U.S. 352 (1983) the Supreme Court invalidated a law stating "we conclude §§ 647(e) is unconstitutionally vague on its face because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute." Id. At 361. Without rules, The Act fails to inform a potential candidate what criteria he must meet before a recommendation for commitment is made, the procedures used to evaluate him, and what he must do to get released, including the components of the treatment plan.

In the instant case, the lack of administrative rules meant that some psychologists did their evaluations in one manner and others did them in a completely different manner, resulting in an arbitrary and capricious application of the statutory scheme to the Petitioner. The examples cited above on the disparity in the actuarial instrument results and interpretation highlight this arbitrariness.

Governments must also comply with standards of procedural due process whenever state action deprives individuals of liberty or property. The nature of the rights an individual is deprived represents a factor to consider when balancing the constitutionality of the denial of procedural protections. Regarding involuntary commitment, no constitutional deprivation is greater than confinement for the course of one's natural life, save execution. Due to procedural deficiencies and the deprivation of the Petitioner's substantive rights, his continued confinement for nearly nine (9) years violates his procedural due process.

In *Kansas v. Hendricks,* 521 U.S. 346 (1997) the Supreme Court applauded Kansas' "strict procedural safeguards" in their sexually violent predator statute. *Hendricks* at 368-69. Because Florida's Act does not employ these strict procedural standards, and lacks rules to apply the law consistently and equally, *Hendricks* supports a determination that Florida's Act is unconstitutional, especially when applied to Petitioner.

In addition, our State and Federal Constitutions provide for equal treatment under, and equal protection of, the law. *See* U.S. Const. Amend. XIV, § 1; Art. I, § 2, Fla. Const. The Florida Supreme Court has said:

The Equal Protection Clause of our state Constitution was framed to address all forms of invidious discrimination under the law, including any persistent disparity in the treatment of rich and poor. We conclude that our clause means just what it says: Each Florida citizen—regardless of financial means—stands on equal footing with all others in every court of law throughout our state. Nowhere is the right to equality in treatment more important than in the context of a criminal trial, for only here can a defendant be deprived by the state of life and liberty.

*Traylor v. State,* 596 So.2d 957, 969 (Fla. 1992) (citations omitted). Although the above quote is in the context of financial ability and right to counsel, equal protection does apply in many other contexts. See *Palm Harbor Special Fire Control Dist. v. Kelly,* 516 So.2d 249 (Fla. 19870. "It is well settled under federal and Florida law that all similarly situated persons are equal before the law." *Palm Harbor* at 251.

The Florida Supreme Court has also said this about the constitutional right of equal protection:

Every particular section of the Declaration of Rights stands on an equal footing with every other section. They recognize no distinction between citizens. Under them every citizen, the good and the bad, the just and the unjust, the rich and the poor, the saint and the sinner, the believer and the infidel, have equal rights before the law. Each right and each citizen, regardless of position, is protected with identical vigor from government overreaching, no matter what the source. Special vigilance is required where the fundamental rights of Florida citizens suspected of wrongdoing are concerned, for here society has a strong natural inclination to relinquish incrementally the hard-won and stoutly defended freedoms enumerated in our Declaration in its effort to preserve public order. Each law-abiding member of society is inclined to strike out at crime reflexively by constricting the constitutional rights of all citizens in order to limit those of the suspect—each is inclined to give up a degree of his or her own protection from government intrusion in order to permit greater intrusion into the life of the suspect. The framers of our Constitution, however, deliberately rejected the short-term solution in favor of a fairer, more structured system of criminal justice:

These rights [enumerated in the Declaration of Rights] curtail and restrain the power of the State. It is more important to preserve them, even though at times a guilty man may go free, than it is to obtain a conviction by ignoring or violating them. The end does not justify the means. Might is not always right. Under our system of constitutional government, the State should not set the example of violating fundamental rights guaranteed by the Constitution to all citizens in order to obtain a conviction.

Thus, even here—especially here—where the rights of those suspected of wrongdoing are concerned, the framers drew a bright line and said to government, "Thus far shalt thou come, but no farther."

*Traylor v. State,* 596 So. 2d at 963-64 (1992) (citations omitted).

In this case, the state has utterly failed to establish any legally adequate administrative rules governing the multidisciplinary team procedures, the protocol for informing the person of the nature of the examination, the criteria for commitment, or the treatment that occurs after commitment. In short, this law is not being applied in a way that is consistent and even-handed. Everything—from what to do, to what to say, to what to look for—is up to the individuals selected to be the "multidisciplinary team" in any given case. Such a statutory scheme, without administrative rules renders the scheme void. The United States Supreme Court has said: "we have recognized recently that the more aspect of the vagueness doctrine "is not actual notice, but the other principle element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement. [Citations omitted]. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."

*Kolender v. Lawson,* 461 U.S. 352 at 358 (1983)(*citing Smith v. Goguen,* 415 U.S. 566 (1974)).

Florida's scheme leaves it up to individuals comprising various multidisciplinary teams to determine who gets evaluated for commitment and who does not, and allows these few select individuals to pursue "their personal predilections" because of the lack of rules. *Id.*

When a person's liberty is at stake, particularly when it is effectively a life sentence as in the instant case, due process requires rules to ensure the law is not applied arbitrarily and capriciously, as it was to the Petitioner; and equal protection requires those same rules to ensure that everyone is treated equally under the rules. Liberty should not turn on who is assigned to a multidisciplinary team.

The most analogous cases involve the state's failure to adopt administrative rules in the DUI arena. In *Mehl v. State,* 632 So. 593 (Fla. 1993), the defendant argued that the failure of HRS (now, the Department of Children and Family Services) to adopt rules for the use and maintenance of gas chromatographs "deprived him of his due process and equal protection rights." *Id.* At 594. The trial court granted the defendant's motion to suppress the evidence. The court of appeal reversed. The Supreme Court approved the DCA result but not the analysis and remanded to the trial court. The Supreme Court interpreted the statutory provisions requiring HRS to adopt rules differently from the Court of Appeal, and found that the HRS had in fact adopted rules governing the areas to which the statute referred.

The District Courts of Appeal have followed through with *Mehl's* holding that the failure to adopt administrative rules as required by statute results in a due process violation. In *State v. Miles,* 732 So.2d 350 (Fla. 1st DCA 1999), review granted, 740 So. 2d 529 (Fla. 1999), the defendant sought to suppress his blood alcohol test results. The basis for the motion was the "alleged inadequacy of the FDLE regulations for the collection of blood samples." *Id.* At 351. The trial court found the administrative rule "inadequate to address the core policies of the state to ensure preservation of a blood sample which will result in an accurate analysis." *Id.* At 352. The appellate court found the trial court's "ruling was consistent with the principles pronounced in Mehl." *Id.* At footnote 3. The appellate court affirmed the trial court's decision to exclude the evidence, subject to some qualifications listed in the opinion. Those qualifications related to an alternative theory of admissibility of the test results. The concurring and dissenting opinion by Judge Wolf noted that "[w]hile the trial court did not directly rule on the constitutionality of the statute or the rule in question, **the court did, however, find that the failure to adopt rules resulted in a denial of due process."** *Id.* At 354. (Emphasis added). The dissent also noted that the "only case dealing with the failure to adopt rules is Mehl." *Id.* At 356.

The Second District Court of Appeal has followed the above cases. In *State v. Townsend,* 746 So. 2d 495 (Fla. 2d DCA 1999), the court indicated that in *Miles,* "the First District decided

the issue presented in this case by affirming a trial court decision that found the rule inadequate to protect the due process rights of persons charged with DUI." *Id.* At 496.

The situation in this case is worse than the inadequate rules in the cases above. Here there were no rules at all when the Office of the State Attorney petitioned the Petitioner, Tom Barker, for involuntary commitment. Obviously, if a rule is insufficient to protect due process rights, then the absence of any rules at all would also be insufficient to protect Petitioner's due process rights. The overriding concern is that the lack of rules, or insufficiency of rules, may lead to inaccurate results (in the blood testing arena). See *State v. Sandt,* 751 So. 2d 136 (Fla. 2d DCA 2000), citing *Miles.* Those identical concerns are present in the instant case, where the State of Florida utilized psychologists and psychiatrists who employed inconsistent and varied methods when they assessed Petitioner.

## II.

## THE RELEASE PROVISIONS VIOLATE SUBSTANTIVE AND PROCEDURAL DUE PROCESS BY SHIFTING THE BURDEN OF PROOF TO THE PETITIONER IN REVIEW HEARINGS

The release provisions of the Act unconstitutionally place the burden of proof for release on the committed individual.

Section 394.918 of the Florida Statues requires a court to examine the "mental condition" of a person committed under this Act at least once every year. Because almost everyone committed under this Act is (or will be) indigent, *see* § 394.928, Fla. Stat. (2002) (taxing costs of commitment to the individual), the court appoints a "qualified professional" to evaluate the person committed. *See* 394.918(1), Fla. Stat. (2002). The expert sends this annual evaluation to the committing court, which then holds a "limited hearing" on whether:

There is probable cause to believe that the *person's condition has so changed* that it is safe for the person to be at large and that the person will not engage in acts of sexual violence if discharged.

§ 394.918(3), Fla. Stat. (2002). Without such a showing, the detainee is denied a trial. *See id.* The statute denies the committed person the right to be present for this hearing. *See id.* Only if the Respondent meets this burden of showing change would the burden shift to the State to prove that "the person's mental condition remains such that the person is not safe to be at large and that, if released, the person is likely to engage in predatory acts of sexual violence." *See* §

394.318(4), Fla. Stat. (2002). The question at the probable cause hearing is not whether the Respondent is currently mentally ill and dangerous, but whether he has "changed" and "will not" commit a sex offense again. Thus, the statute places a very heavy burden on the Respondent.

The United States Supreme Court held, however,  in *Foucha v. Louisiana,* 504 U.S. 71 (U.S.La.1992), that the constitution requires that the state bear the burden to prove the need for recommitment. The Louisiana statute in *Foucha* concerned criminal insanity, but the release provisions of the law were much like those of the Act. The Louisiana statute, as quoted in part by Justice Thomas in his dissent, is startlingly similar to the provisions in section 394.918 of the Florida Statutes:

Article 655(B) provides:

A person committed pursuant to Article 654 may make application to the review panel for discharge or for release on probation. Such application by a committed person may not be filed until the committed person has been confined for a period of at least six months after the original commitment. If the review panel recommends to the court that the person be discharged, conditionally or unconditionally, or placed on probation, the court shall conduct a hearing following notice to the district attorney. If the recommendation of the review panel or the court is adverse, the applicant shall not be permitted to file another application until one year has elapsed from the date of determination.

*Foucha,* 504 U.S. at 105 n.3.

Article 657 provides:

After considering the report or reports filed pursuant to Articles 655 and 656, the court may either continue the commitment or hold a contradictory hearing to determine whether the committed person can be discharged, or can be released on probation, without danger to others or to himself. At the hearing, *the burden shall be upon the committed person to prove that he can be discharged, or can be released on probation, without danger to others or to himself….*

The court invalidated the statute, partly because it did not require proof of continued mental illness, and partly because of the improper allocation of the burden of proof:

[T]he State now claims that it may continue to confine *Foucha*, who is not now considered to be mentally ill, solely because he is deemed dangerous, *but without assuming the burden of proving even this ground for confinement by clear and convincing evidence.* The court below gave no convincing reason why the procedural safeguards against unwarranted

confinement which are guaranteed to insane persons and those who have been convicted may be denied to a sane acquitee, and the State has done no better in this Court.

*Id.* At 452; *see also Levine v. Torvik,* 986 F.2d 1506 (6th Cir. 1993). *Levine* is a post-*Foucha* case involving the continued confinement of an insanity acquitee. The mental health expert testified that Mr. Levine was "not currently displaying any signs or symptoms of active mental illness…. [T]his diagnosis of a mood disorder in full remission will remain with Levine for Life; in other words, no matter how well he behaves in the future, no behavior can ever produce a more favorable diagnosis." *Levine,* 986 F.2d at 1513. The Sixth Circuit noted that the state court relied not on Levine's current mental condition, but on the past behavior which led to his commitment. That practice amounted to an "irrebuttable presumption that Levine can *never* be released." *Id.* At 1514.

Sections 394.918 through 394.920 violate this principle by permitting indefinite detention without requiring periodic judicial review wherein the State bears the burden of proof.

Justices Kennedy and Thomas wrote dissents in *Foucha,* but only on the basis that insanity acquittees were a distinct class meriting different treatment from the civilly committed. *See Foucha,* 504 U.S. at 94 (Kennedy, J., dissenting); *id.* At 108 (Thomas, J., dissenting). Justice Thomas's dissent noted that many state laws placed the burden of proof for release on the insanity acquittee, *see id.* At 112 n.9, and would therefore be invalidated by the majority decision. Justice Thomas was correct. Several state courts, in light of *Foucha,* quickly invalidated laws that did not place the burden on the state to prove continuing grounds for commitment. *See State v. Boudreaux,* 605 So.2d 608 (La., 1992); *Williams v. Commonwealth,* 16 S.E.2d 16 (Va. Ct. App. 1994). For example, the Kansas Court of Appeals held in *Application of Noel,* 838 P.2d 336 (Kan. Ct. App. 1992):

The current statutory scheme used to determine the need for continued commitment of insanity acquitees violates the Due Process and Equal Protection Clauses of the 14th Amendment by not placing the burden of proof upon the State to show by clear and convincing evidence both the committed person's continued insanity and dangerousness.

*Id.* At 345.

The state asked the Fifteenth Judicial Circuit Court to civilly commit the Petitioner on July 17, 2002, to a scheme from which there is no constitutionally adequate review, in violation of the Due Process and Equal Protection Clauses of the state and federal constitutions. *See* U.S. Const. Amend. XIV; & Art. I, §§ 2 & 9, Fla. Const. Thus, the Honorable Court should issue the petition for writ of habeas corpus to the Respondent Florida Department of Children and Family Services, et al., respondents to demonstrate why relief should not be granted to the Petitioner, Tom Barker.

## III.

**Petitioner Was Not Considered Amenable For Treatment When He Was Serving His Criminal Sentence in the Florida Department of Corrections Because He Does Not Suffer From a Psychosexual Disorder**

Petitioner should have been considered amenable for treatment when he was an inmate in the Florida Department of Corrections, if in fact at that time and place he was an individual suffering from a psychosexual disorder. *See* Rule 33-19.001(3). Notwithstanding, Petitioner should have been considered amenable to treatment for this disorder if in fact he had a psychosexual disorder; and, had an intellectual capacity for logical reasoning and insight. Respondent the Florida Department of Children and Family Services, et al., respondents knew or should have known, at that time and place when Petitioner was serving his criminal sentence in the Florida Department of Corrections, if Petitioner was indeed psychotic, or that he suffered from a brain injury, disease, or other central nervous system condition that would have precluded effective treatment for a psychosexual disorder.

Effective July 1, 1991, in light of a severe budgetary shortfall, the Florida Legislature repealed § 917.012, which prescribed the procedures, treatment and handling of MDSO's Ch. 91-225 preamble and § 25, Laws of Fla. (1991). However, the legislature left intact § 945.12, Fla. Stat., which even today authorizes the Department of Corrections to transfer prisoners requiring special services, *including treatment for sexual deviation, to appropriate public or private facilities that offer treatment and secure confinement.*

The Department of Corrections had the legislative authority, under § 945.12, at any time during Defendant's criminal sentence to transfer him from the custody of the DOC to the DCF for sex offender evaluation and treatment in accordance with § 917.012:

**945.12. Transfers for Rehabilitative Treatment**

    (1) The Department of Corrections is authorized to transfer substance abuse impaired persons, as defined in chapter 397, and tuberculosis or *other prisoners requiring specialized services* to appropriate public or private facilities or programs for the purpose of providing specialized services or treatment for as long as the services or treatment is needed, *but for no longer than the remainder of the prisoner's sentence.*(emphasis added)

    (4) When, in the opinion of the superintendent of an institution to which a prisoner has been transferred, such prisoner has been cured, or will no longer benefit from treatment at that institution, other than a mentally ill prisoner, the superintendent shall notify the department which shall, at the earliest practicable date thereafter, convey such prisoner to the appropriate classification center for reclassification.

    (6) A prisoner who has been determined by the Department of Children and Family Services and the Department of Corrections to be amenable to rehabilitative treatment for *sexual deviation,* and who has voluntarily agreed to participate in such rehabilitative treatment, may be transferred to the Department of Children and Family services provided appropriate bed space is available. (emphasis added)

    Section 945.12, Fla. Stat. (1999)

    Accordingly, even with the 1991 repeal of § 917.012, rehabilitative sex offender treatment during Petitioner's prison term was and remains available even today under § 945.12. *State v. Mendoza,* 591 So.2d 1029 (Fla. 3d DCA 1991), *rev. den.* 599 So.2d 654 (Fla. 1992); § 945.12 Fla. Stat. (1999).

    It should be noted that had Petitioner been transferred to DCF custody for the residential sex offender treatment it would have had a direct bearing on the length of Petitioner's DOC sentence, thus affecting substantive due process. *Dorman v. State,* 457 So.2d 503 (Fla. 1st DCA 1984), citing Committee Note (d)(11), *In re Rules of Criminal Procedure (Sentencing Guidelines),* 439 So.2d 848, 852 (Fla. 1983).

The question of whether this Petitioner was a suitable candidate to enter the DOC/DCF, program for mentally disordered sex offenders could have only been answered after he had been screened during his sentence by the persons and entities in charge of the facilities with the expertise to examine and evaluate the Petitioner for that purpose.

Notwithstanding, the legislative repeal of § 917.012, the statutes in effect at the time of Petitioner's crime control the penalty at sentencing. *Cook v. State,* 519 So.2d 31 (Fla. 2d DCA 1987); *State v. Pizarro,* 383 So.2d 762 (Fla. 3d DCA 1980).

Further, any subsequent repeal or amendment of § 917.012, Fla. Stat. Cannot effect punishment for any crime previously committed by Petitioner. *Skinner v. State,* 383 So.2d 767 (Fla. 3d DCA 1980), citing *Castle v. State,* 305 So.2d 794 (Fla. 4th DCA 1974), *aff'd,* 330 So.2d 10 (Fla. 1976).

In the instant case, when construing the language of a statute, courts are required to first consider the actual language of the statute. *Woodham v. Blue Cross & Blue Shield of Florida, Inc.,* 829 So.2d 891, 897 (Fla. 2002); *Campbell v. Kessler,* 848 So.2d 369, 371 (Fla. 4th DCA 2003) (finding that a court must construe a statute according to the precise language used by the legislature). In interpreting a statute, we must give statutory language its plain and ordinary meaning. *Green v. State,* 604 So.2d 471, 473 (Fla. 1992) (citing Southeastern Fisheries Ass'n, Inc. v. Dep't of Natural Res., 453 So.2d 1351 (Fla. 1984)). If the plain and ordinary meaning can be discerned from the language of the statute, courts need not examine legislative history. *State v. Sousa,* 903 So.2d 923, 928 (Fla. 2005). Furthermore, the plain and ordinary meaning of a word can be gleaned from a dictionary. *Green,* 604 So.2d at 471.

## CONCLUSION

It is the Petitioner's position, that respondent the Florida Department of Children and Family Services, et al., respondents breached their duty because they knew or should have known that Petitioner does not suffer from a psychosexual disorder, and that by their acts or omissions when he ended his criminal sentence he should not have been petitioned and transferred to the Jimmy Ryce Act, this is an *ex post facto* violation and a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Equal Protection of the Laws. Finally, even if a law operates to the Petitioner's detriment, the ex post facto prohibition does not restrict "legislative control of remedies and modes of procedure which

do not affect matters of substance." *See, Dobbert,* 432 U.S., at 293, 97 S.Ct., at 2298. Hence, no ex post facto violation occurs if the change in the law is merely procedural and does "not increase the punishment, nor change the ingredients of the offence or the ultimate facts necessary to establish guilt." *Hopt v. Utah,* 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884). *See Dobbert, supra,* at 293-294, 97 S.Ct., at 2298 ("The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime"). On the other hand, a change in the law that alters a substantial right can be ex post facto "even if the statute takes a seemingly procedural form." *Weaver,* 450 U.S., at 29, n. 12, 101 S.Ct., at 964, n. 12.

Petitioner asserts that, in the underlying facts of this case as mentioned herein and although the distinction between substance and procedure might sometimes prove elusive, here the change at issue appears to have little about it that could be deemed procedural. *Miller v. Florida,* 107 S.Ct. 2446, 482 U.S. 423, (U.S. Fla. 1987).

Section 917.017, Florida Statutes (1981), provides that HRS shall not permit entry of a sex offender into any of its residential sex offender treatment programs unless the procedure specified in Section 917.012, Florida Statutes (1981), is followed with respect to that sex offender. Florida Dept. of Health and Rehabilitative Services v. Gross, 421 So.2d 44, (Fla.App. 3 Dist. 1982).

The Jimmy Ryce Act, §§ 394.910 to 394.931, Fla. Stat. Which governs the involuntary civil commitment of sexually violent predators, is deemed to be civil in nature, *Mitchell v. State,* 911 So.2d 1211 (Fla. 2005); rather than criminal. *Williams v. State,* 852 So.2d 433 (Fla. Dist. Ct. App. 5th Dist. 2003). However, because of the consequences of commitment and indefinite loss of freedom are severe, some constitutional rights which may not be applicable to strictly civil proceedings may carry over to proceedings brought pursuant to the Act. *Kakuk v. State,* 908 So.2d 1088 (Fla. Dist. Ct. App. 5th Dist. 2005), review denied, 918 so.2d 292 (Fla. 2005). Moreover, involuntary civil commitments of sex offenders under the act constitute significant deprivations of liberty that require due process protection. *Allen v. State,* 873 So.2d 576 (Fla. Dist. Ct. App. 2d Dist. 2004).

Respectfully submitted,

February 27, 2009

Petitioner, Tom Barker, pro se,
DCF # 143,
Florida Civil Commitment Center
13613 S.E. Hwy. 70,
Arcadia, Florida 34266


## CERTIFICATE OF SERVICE

   I HEREBY CERTIFY, that a true and correct copy of the foregoing will be mailed by regular U.S. Mail to: **Florida Department Of Corrections,** 2601 Blairstone Rd., Tallahassee, FL 32399-0700; and that a true and correct copy was mailed to: **Department of Children and Family Services,** 1317 Winewood Blvd., Bldg., #6, Tallahassee, Fl., 32399, as soon as copies and postage are available.

By: 

Tom Barker, Petitioner, Pro se